**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JONATHAN RIDEOUT, | : | |
| Plaintiff, | : | |
| | : | NO. 5:25-cv-04766-JMG |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| LB WATER SERVICES, INC., | : | |
| Defendant. | : | ELECTRONICALLY FILED |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW/MOTION FOR JUDGMENT AS A MATTER OF LAW, OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL, OR, IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL ON DAMAGES, OR, IN THE ALTERNATIVE, A REMITTITUR**


| | |
|---|---|
| **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>Christopher J. Conrad, Esquire<br>PA Atty. I.D. No. 202348<br>Daniel P. McGannon, Esquire<br>PA Atty. I.D. No. 309357<br><br>200 Corporate Center Drive, Suite 300<br>Camp Hill, PA 17011<br>Ph: (717) 651-3531/(717) 651-3717<br>Fax: (717) 651-3707<br>Email: cjconrad@mdwcg.com<br>dpmcgannon@mdwcg.com | **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>Thomas A. Specht<br>PA Atty. I.D. No.: 78686<br>Suzanne T. Tighe<br>PA Atty. I.D. No.: 80179<br><br>P.O. Box 3118<br>Scranton, PA 18505-3118<br>Ph: (570) 496-4600<br>Fax: (570) 496-0567<br>Email: taspecht@mdwcg.com<br>sttighe@mdwcg.com |

# TABLE OF CONTENTS


PAGE

TABLE OF AUTHORITIES ........................................ iii

*Procedural History* ........................................ 1

*Factual Background* ........................................ 1

1. Plaintiff's Testimony ........................................ 1
2. Saresa Rideout Testimony ........................................ 6
3. Jamie Gelvin Testimony ........................................ 7
4. Adam White Testimony ........................................ 8
5. Sarah Romansik Testimony ........................................ 11
6. Rochelle Collier ........................................ 13

*Standards of Review* ........................................ 13

*Questions Involved* ........................................ 13

*Argument* ........................................ 14

**A. LBWS is entitled to judgment as a matter of law under Fed. R. Civ. P. 50(b), 59(e), or 60(b)(6), or, in the alternative, a new trial under Fed. R. Civ. P. 59(a), 59(e), on the basis that Plaintiff failed to present sufficient evidence at summary judgment, as well as at trial, in support of his ADA/PHRA disability discrimination and retaliation claims** ........................................ 14

*Insufficient Evidence of ADA/PHRA Associational Discrimination* ........................................ 14

*Insufficient Evidence of Pretext* ........................................ 19

*Insufficient Evidence of Retaliation under the ADA/PHRA* ........................................ 21

**B. This Court should grant LBWS's motion for a new trial on damages or, in the alternative, a remittitur, under Fed. R. Civ. P. 59(a), 59(e), and 60(b)(6), based upon the unfairness and excessiveness of the jury's verdict in favor of Plaintiff** ........................................ 23

**C. This Court should grant LBWS's motion for a new trial, under Fed. R. Civ. P. 59(a), 59(e), because the jury's verdict was against the weight of the evidence** ........................................ 29

**PAGE**

*The Great Weight of the Evidence Calls for a New Trial*..........................................29

*Conclusion*..........................................................................................30

**EXHIBITS**

**CERTIFICATE OF SERVICE**

# TABLE OF AUTHORITIES

**PAGE**

*Cases*

*Abramson v. William Patterson Coll. of N.J.*,
260 F.3d 265 (3d Cir. 2001)....22

*Abrams v. Lightolier, Inc.*,
841 F. Supp. 584 (D.N.J. 1994)....26, 29

*Barker v. Int'l Paper Co.*,
993 F. Supp. 10 (D. Me. 1998)....17

*Blakey v. Continental Airlines, Inc.*,
992 F. Supp. 731 (3d Cir. 1998)....24

*Bolden v. SEPTA*,
21 F.3d 29 (3d Cir. 1994)....24

*CG v. Pennsylvania Dept. of Educ.*,
734 F.3d 229 (3d Cir. 2013)....20

*Dee v. Borough of Dunmore*,
2010 U.S. Dist. LEXIS 39166 (M.D. Pa. Apr. 21, 2010)....25, 29

*Delli Santi v. CNA Ins. Cos.*,
88 F.3d 192 (3d Cir. 1996)....24, 26-27, 29

*Den Hartog v. Wasatch Academy*,
129 F.3d 1076 (10th Cir. 1997)....15-16, 18

*Douglas v. Kensington Cmty. Corp. for Individual Dignity*,
775 F. Supp. 3d 881 (E.D. Pa. 2025)....15

*Erdman v. Nationwide Ins. Co.*,
582 F.3d 500 (3d Cir. 2009)....17-22

*Evans v. Port Auth.*,
273 F.3d 346 (3d Cir. 2001)....23-24, 27

*Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*,
784 F.3d 177 (3d Cir. 2015)....14

**PAGE**


*Fuentes v. Perskie*,
32 F.3d 759 (3d Cir. 1994)......20

*Gagliardo v. Connaught Labs., Inc.*,
311 F.3d 565 (3d Cir. 2002)......24, 28

*Glass v. Snellbaker*,
2008 U.S. Dist. LEXIS 71241 (D.N.J. Sept. 17, 2008)......25-26, 29

*Gumbs v. Pueblo In'tl, Inc.*,
823 F.2d 768 (3d Cir. 1987)......23

*Gunby v. Pennsylvania Electric Co.*,
840 F.2d 1108 (3d Cir. 1988)......24-25, 29

*Hollingsworth v. R. Home Prop. Mgmt, LLC*,
498 F. Supp. 3d 590 (E.D. Pa. 2020)......20

*IPPV Enters., LLC v. Echostar Communs. Corp.*,
191 F. Supp. 2d 530 (D. Del. 2002)......23

*Kazan v. Wolinski*,
721 F.2d 911 (3d Cir. 1983)......23

*Kennedy v. Chubb Grp. Of Ins. Co.*,
60 F. Supp. 2d 384 (D.N.J. 1999)......22

*Larimer v. IBM*,
370 F.3d 698 (7th Cir. 2005)......15

*Merit v. SEPTA*,
315 F. Supp. 2d 689 (E.D. Pa. 2004)......22

*Oliveras-Sifre v. Puerto Rico Dep't of Health*,
214 F.3d 23 (1st Cir. 2000)......17

*Rinehimer v. Cemcolift*,
292 F.3d 375 (3d Cir. 2002)......14

*Runner v. C.R. Bard, Inc.*,
108 F. Supp. 3d 261 (E.D. Pa. 2015)......28

*Scott v. Allied Waste Serv. of Bucks-Mont*,
2010 U.S. Dist. LEXIS 136202 (E.D. Pa. Dec. 23, 2010)......19

**PAGE**

*Shellenberger v. Summit Bancorp., Inc.*,
318 F.2d 183 (3d Cir. 2003)......22

*Spence v. Board of Education*,
806 F.2d 1198 (3d Cir. 1986)......24, 29

*Strate v. Midwest Bankcentre, Inc.*,
398 F.3d 1011 (8th Cir. 2005)......18

*Tucker v. Concrete*,
2024 U.S. Dist. LEXIS 63222 (D.N.J. April 5, 2024)......19

*Tyndall v. Nat'l Educ. Ctrs., Inc. of Ca.*,
31 F.3d 209 (4th Cir. 1994)......15-17

*Tyson v. Access Services*,
158 F. Supp. 3d 309 (E.D. Pa. 2016)......17

*Unisplay, S.A. v. American Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995)......23

*Walton v. Mental Health Ass'n of Southeastern Pennsylvania*,
168 F.3d 661 (3d Cir. 1999)......20-21

*Williamson v. Conrail*,
926 F.2d 1344 (3d Cir. 1991)......29

***Regulations, Rules, & Statutes***

*29 C.F.R. § 1630.8, Appendix*......15, 17, 22

*42 U.S.C. § 12112(b)(4)*......14-15, 17-18, 22

*42 U.S.C. § 12112(b)(5)*......15

*42 U.S.C. § 12203(a)*......21-22

***Miscellaneous***

H.R. Rep. No. 101-485, pt. 2......16

Defendant, LB Water Services, Inc., (LBWS), hereby submits this memorandum of law in support of its post-judgment motions.

*Procedural History*

LBWS hereby incorporates by reference the "Procedural History" recited in its post-judgment motions, filed concurrently herewith, as if fully restated herein.

*Factual Background*

1. <u>Plaintiff's Testimony</u>.

Plaintiff lives in Ephrata, PA, with his wife and three children, ages 11 (Jonathan, Jr.), 10 (Jagger), and 6 (Emery). *Doc. 60*, at p. 52. In June 2021, he started working for LBWS in the warehouse because the health care being offered by LBWS was excellent. *Id.* at p. 53.

LBWS is a company that provides all water supplies. *Id.* LBWS eventually promoted Plaintiff to truck driver, and paid for him to get a CDL. *Id.* at pp. 53-54. Plaintiff's work hours were 7am to 5pm every day but Tuesday – when LBWS allowed him to work 6am to 4pm – because he had to get out early to ensure his disabled daughter got to therapy. *Id.* at p. 55, 84-85.

LBWS possessed an emergency phone for after-hour emergencies like water-main breaks, which enabled customers to call LBWS regarding product availability outside company hours (5:01 pm to 6:59 am). *Id.* at pp. 56-57. The employee with phone duty would answer the phone and find out what was needed by the customer (noting and describing the problems). *Id.* at p. 57.

When Plaintiff started at LBWS, the LBWS after-hours emergency phone responsibility was held by Bob Swagart – a salesman. *Id.* He handled customer needs directly when they called, because he had a company-issued laptop at home. *Id.* at pp. 55-56.

On the other hand, Plaintiff did not have a company laptop with a program to review LBWS inventory from home, and, when he had the emergency phone duty, if he got a call, he

would need to travel to the warehouse to see if LBWS had what the customer had requested. *Id.* at p. 56. When Plaintiff had responsibility for the emergency phone, he would have to ensure his kids were taken care of before proceeding to the LBWS warehouse. *Id.* at p. 57.

Plaintiff volunteered to assist his co-worker, Jerry Maldanado, with emergency phone duty after Mr. Swagart went on medical leave. *Id.* at p. 58. Plaintiff and Jerry swapped off every week/every Friday. *Id.* They switched off handling the phone on a weekly basis, and if one or the other had something on the weekend, they would help each other out. *Id.* at pp. 58, 84. One weekend per year, Jerry and Plaintiff would take their kids camping together and, during that weekend, would get coverage from the assistant warehouse manager. *Id.* at p. 58.

One was not paid for holding the emergency phone but only if the phone rang. *Id.* at pp. 58, 84. At that point, the employee with phone duty would be paid to proceed to the warehouse, clock in, and take care of the problem. *Id.* at pp. 58-59.

Plaintiff testified that his children have disabilities, with his seven-year-old daughter suffering from hemiplegia cerebral palsy, which causes half of her body to not work properly, and his ten-year-old son possessing an intellectual disability. *Id.* at pp. 59-60, 81. When he worked for LBWS, his children had therapy almost every day, and also received services at school. *Id.* at pp. 60, 86. His daughter received physical therapy from two different providers, while also receiving occupational and speech therapy. *Id.* at p. 60. His son also received speech and occupational therapy. *Id.* Both children received special therapy for eating. *Id.* Plaintiff covered most of his daughter's appointments, and his wife covered the rest. *Id.* at pp. 60-61.

Plaintiff asserted that LBWS knew about his kids' needs and disabilities before August 2023. *Id.* at p. 61. He stated that, before he was hired, he was interviewed by and discussed his children with then-LBWS location manager, Bob Campbell. *Id.* at pp. 61, 82-83. He indicated

that Campbell helped Plaintiff with an altered Tuesday schedule, when Plaintiff worked 6-4, instead of 7-5, to allow him to pick up his daughter and take her to her 5pm physical therapy appointment. *Id.* at pp. 61-62. He stated that other supervisors/managers also knew about his Tuesday schedule. *Id.* at p. 62. Finally, he contended that Human Resources also knew about his children, as Sarah Romansik, whose child was also autistic, had helped Plaintiff get insurance approval for genetic testing. *Id.* at pp. 63, 82-83.

Plaintiff was out of work on disability, *Id.* at p. 63, and when he returned to LBWS in late-August 2023, he had a new manager – Adam White. *Id.* at p. 64. Plaintiff had never before worked with White. *Id.* at p. 65. Upon his return to work, Plaintiff conversed with White, explaining his Tuesday schedule, and "everything about his children," and that the specialist in Philadelphia will sometimes call about cancellations and request that his daughter come in earlier to see a neurologist. *Id.* He also said that he explained his home life with his children, and told Adam White that his kids are disabled. *Id.* at pp. 65-66, 86.

Two days later, August 31, 2023, a warehouse meeting was held, at which Mr. White announced that Plaintiff would be receiving the emergency phone, and Plaintiff said that his house did not currently allow him to commit to that at the moment. *Id.* at pp. 66, 87. White said that he would speak to Plaintiff later, and subsequently called Plaintiff into his office. *Id.* at p. 66.

According to Plaintiff, at that meeting, White told Plaintiff that he was not asking but telling Plaintiff what he would be doing (taking the emergency phone duty year round). *Id.* at pp. 66, 88. Plaintiff responded that, with his home life and kids, he could not do it. *Id.* at pp. 66, 89. Mr. White related that he wanted Plaintiff to take the phone because he wanted customers to have a particular face and voice, and because of Plaintiff's proximity to work, and they could discuss a rotation later. *Id.* at pp. 66-68, 89-90.

Plaintiff said that his wife was in a master's degree program and that, once he got home, until his wife got out of class at night, he was the sole caregiver for his kids. *Id.* at p. 67. He indicated that he could do a rotation, and also offered that, if a salesperson with a computer had the phone, the salesperson could handle the phone, message Plaintiff, and he would work it out so that he could go get the parts for the customer. *Id.* Plaintiff testified that, in this way, he would avoid having to leave home for no reason for parts LBWS did not have – making it a quick run to the warehouse and back home. *Id.* As per Plaintiff, White said that they could discuss a rotation later, but that, he would be the one carrying the phone for the foreseeable future. *Id.* at p. 68.

When told about Plaintiff's children, White told Plaintiff that we all have home problems. *Id.* Plaintiff asked White if the emergency phone duty came with a raise. *Id.* at p. 69.

On September 1, 2023, when Plaintiff arrived at work, the phone was inside his locker. *Id.* Plaintiff asked for a meeting with Mr. White. *Id.* When the meeting ended, he placed the phone in front of White and walked out. *Id.*

About half an hour later, White called Plaintiff and said he was giving Plaintiff another chance to take the phone. *Id.* at p. 70. Plaintiff did not refuse to take the phone initially but asked for compensation to take the phone which was denied. *Id.* at pp. 70, 91-92. Plaintiff said he could not take the phone and White terminated him. *Id.* at pp. 70, 92-93

After he was fired, Plaintiff clocked out, tossing an iPad on the floor, and then "talked"[1] to Jamie Galvin – who was managing two LBWS sites at the time, and was helping Mr. White transition into the manager's job. *Id.* at p. 71. Galvin was the warehouse manager of another site

[1] Plaintiff later admitted there was no record of any such conversation, and, in fact, there was no such conversation. *Doc. 60*, at p. 95; *Doc. 61*, at p. 33.

but managed Plaintiff's site as well. *Id.* at p. 72. Plaintiff explained the situation, contending that Galvin didn't it was right but White had to be able to run his own warehouse. *Id.* at pp. 72, 94.

Plaintiff stated that he also called Sarah Romansik from his car. *Id.* at p. 72. She told him that Mr. White had told her that the phone duty was going to be a rotation and that Plaintiff was refusing to do his part. *Id.* at pp. 72, 94. Plaintiff asked to call White with Romansik on speakerphone but he lost his temper, and yelled across the office at White, calling him a "pussy ass bitch." *Id.* at pp. 72-73. In a September 1, 2023 (12:20pm) email from Plaintiff to Romansik, Plaintiff apologized, writing that she "had always been great," and mentioned nothing about any alleged denied accommodation or retaliation. *Id.* at pp. 73, 95; Ex. J-14 (attached hereto).

That day, Plaintiff also texted Troy Dressler, LBWS's vice president to find out if he would have to pay LBWS back for his CDL because he had only completed year one of a three-year contract. *Id.* at pp. 74, 96. Mr. Dressler told him that because he did not leave voluntarily, he would not have to pay back the CDL. *Id.* at p. 74. Plaintiff also learned from Dressler that the "tossed iPad" was broken, and Plaintiff offered to make that right. *Id.* There was no mention of having requested an accommodation from Mr. White, or the medical needs of his children. *Id.* at p. 96; *see also D-1* (attached).

On September 1, 2023, *see J-13* (attached), LBWS sent a termination letter to Plaintiff. *Id.* at p. 75. On September 4, 2023, Plaintiff sent an email in response. *See D-2* (attached). In the email, he stated that he informed Mr. White that he is responsible for 3 of the 8 therapies for his kids, homework, food, shower, and bed, and that he works two jobs. *D-2.* No allegation that LBWS discriminated against him in terminating him, or terminated him or retaliated against him because of his association with disabled children was made in the letter.

Plaintiff generally testified as to the consequences of his termination. *Doc. 60*, at pp. 76-81. He indicated that, as a truck driver for LBWS, he received health insurance, and made $900-$1600 per week. *Id.* at pp. 76-77. After he was fired, he worked for DoorDash (which didn't offer health insurance) and Cooper Booth Wholesale as a truck driver. *Id.* at p. 77. He then provided full-time security for a homeless shelter, and later part-time security and supervision of the shelter, making $20 per hour and paying for health insurance. *Id.* at pp. 77-78.

Plaintiff stated that he advised Mr. White of his need for accommodation because he told him he could not handle the emergency phone indefinitely or permanently. *Id.* at p. 91. He admitted that he did not reach out to Ms. Romansik to discuss the situation. *Id.*

He also admitted that LBWS, as his employer, had the right to assign job tasks to certain positions within the job description and typical job duties. *Id.* at p. 97. He admitted that Bob Swagart had held the emergency phone duty a couple of years. *Id.* at p. 98.

2. Saresa Rideout Testimony.

Plaintiff's wife, Saresa Rideout, testified as to her children's disabilities and their schedule of services. *Id.* at pp. 101-105. She noted that she, her mother, and Plaintiff took them to their appointments. *Id.* at p. 105.

She stated that she and Plaintiff were disappointed and scared after he was fired because she had quit her job the week before. *Id.* at pp. 105-106. She stated that, after he was fired, Plaintiff became very withdrawn, stayed in bed, and became very pessimistic about making decisions. *Id.* at p. 106. She said he seemed very insecure about about decisionmaking, and would run through every negative scenario before making a decision. *Id.* After his termination, he would not get up as early as usual, and, when he would get up to help with the kids to get them to school, he would go back to sleep afterwards. *Id.* She noted that Plaintiff is better today

but still has a tendency to "weigh his options a lot," is still pessimistic, and "[i]f talking about something big," Plaintiff will not want to do it if it has any type of "con" to it. *Id.* at p. 107.

She had no personal knowledge of the circumstances of Plaintiff's termination. *Id.* at p. 109. She is not a licensed medical professional and could not diagnose her husband. *Id.*

3. Jamie Gelvin Testimony.

Mr. Gelvin has been Senior Manager at the Chambersburg and Ephrata locations for LBWS for approximately the past five years. *Id.* at p. 117. He personally supervised Plaintiff for a few months as interim manager before Adam White arrived. *Id.* at p. 118.

He stated that there was no written policy at LBWS requiring a single employee to carry the phone indefinitely, no written policy defining how long a person would be required to carry the phone, no written policy that addressed an assignment of the phone with no end date, and no written policy that addressed whether refusal to carry the phone would mean termination. *Id.* at pp. 118 -119. He related that managers and employees can trade time on the phone. *Id.* at p. 119. He indicated that, *other than a manager's discretion*, there was no company-wide rule mandating indefinite, on-call, emergency phone duty. *Id.*

He referenced a discipline guide at LBWS that allows coaching and documentation and doesn't require immediate termination for every act of insubordination. *Id.* However, he stated that different managers, in their discretion, may handle insubordination differently. *Id.*

He explained the assignment of the emergency phone duty. *Id.* at pp. 120-121. He testified that, from the time the phone rang until the person retrieved the material for the customer and returned home, the person would be paid at the overtime rate. *Id.* at p. 121. He noted that, at the Epharata location, there had always been an employee rotation. *Id.* He related

that the phone would only ring three times a year, and that, from a manager's perspective, it was not an onerous assignment for an employee to take the emergency phone duty. *Id.* at pp. 121-122.

Under LBWS's discipline guide, *see J-7* (attached), a manager could exercise his or her discretion to terminate an employee for insubordination. *Id.* at p. 122. A manager retains the right to fire an employee for insubordination depending on the severity. *Id.* at p. 123.

4. <u>Adam White Testimony</u>.

He is Manager of LBWS's Epharata location. *Id.* at p. 127. He was hired as location manager in June of 2023. *Id.* at pp. 127-128. His primary responsibilities as location manager include overseeing the whole operation, including anything from sales and purchasing to logistics, truck driving, warehousing, and staff schedules. *Id.* at p. 128.

He first met Plaintiff (a truck driver) in the office/shop on August 29, 2023. *Id.* at p. 128 Truck drivers deliver products and operate heavy duty equipment – Class A, B, and CDL vehicles, work in the warehouse, and interface with customers. *Id.* at pp. 128-129.

Customers contact LBWS via phone, email, or can approach the sales counter to place an order. *Id.* at p. 129. After hours, each location has an emergency phone contact line. *Id.* at pp. 129-130. Most salespeople have really good rapport with their customers, so they are typically contacted first, or White would get a call, but the emergency line is available too. *Id.* at p. 130.

The emergency phone is a cell phone. *Id.* Employees get the emergency phone assigned to them on a rotational basis. *Id.* Typically, in Epharata, anywhere from two to four individuals take a rotation that can last anywhere from a week to a month. *Id.* at pp. 130-131.

The employee who has the phone is expected to answer it, address the emergency, and go assist the customer. *Id.* at p. 131. If there is a conflict or vacation or if they're unavailable, they have a right to call other employees for assistance. *Id.*

On August 31, 2023, there was an LBWS warehouse meeting. *Id.* The topic of rotation of the emergency phone was one of the agenda items. *Id.* at p. 132. Nothing on the agenda stated that Plaintiff would be the only on-call employee, or that the assignment would be permanent, or indefinite. *Id.* at p. 144. Mr. White asked Plaintiff to take the phone. *Id.* at pp. 132-133. His response during the meeting was: "[W]e would need to talk further about that." *Id.* at p. 133. Plaintiff's job description did not specify 24/7 on-call phone rotation, but it was encompassed under "whatever it takes to get the job done." *Id.* at pp. 145-146.

Mr. White and Plaintiff discussed the topic after the meeting in the conference room. *Id.* at p. 133. Plaintiff told him that he was unable to participate in the rotation and carrying the emergency phone. *Id.* White informed Plaintiff that it was a basic function of the job. *Id.* Plaintiff said he could not take the phone duty because he had obligations outside of work. *Id.* White indicated that they all have obligations in their personal lives but that doesn't stop one from performing basic functions of the job – so he needed to take the phone. *Id.* at pp. 133-134.

Plaintiff said nothing about his children or their disabilities during this conversation. *Id.* at p. 134. And Mr. White said he was unaware that Plaintiff had kids at the time. *Id.* Plaintiff never mentioned that he needed an accommodation to perform the duty. *Id.*

On August 31, 2023, the issue was not resolved despite back and forth conversations. *Id.* Prior to August 31, 2023, no one had ever refused the phone assignment. *Id.* at p. 143.

The following morning, in another conference room meeting, Plaintiff asked for additional compensation to hold the emergency phone. *Id.* at p. 134.

On average, only approximately once a year would an employee need to go into the facility when handling the emergency phone. *Id.* at pp. 135-136. Employees could trade off the phone with other people without supervisor involvement. *Id.* at p. 136. Mr. White had no reason

to believe that Plaintiff did not know that. *Id.* at pp. 136-137. White did not believe that Plaintiff could reasonably have had the understanding that he had been permanently assigned the phone. *Id.* at pp. 137, 140. White was clear that it was a rotation and it still is today. *Id.* at p. 137.

Mr. White explained that, if Plaintiff were to come in and handle an emergency call and help a customer, Plaintiff would be getting paid overtime. *Id.* White again requested that Plaintiff take the phone but he declined. *Id.* at p. 138.

Because Mr. White had given a direction a few times over the course of two days, he reached out to Human Resources for guidance, explaining to Sarah Romansik, Director of Human Resources, that he had a situation where an employee was being insubordinate and that he needed to know how he should proceed. *Id.* at pp. 138, 151-152. She directed White to give Plaintiff one final opportunity to agree to take his turn in the rotation holding the phone, and advise him that his job was very much on the line if he refused. *Id.* at p. 138.

Up to this point, Plaintiff had never mentioned his children or their disabilities as a reason to refuse the phone. *Id.* at pp. 138-139. Plaintiff had not requested or mentioned that he needed an ADA accommodation to carry the phone. *Id.* at p. 139. Plaintiff never expanded upon "circumstances outside of work." *Id.* Mr. White took that statement to mean "personal lives" and he had "no sense, no knowledge, no understanding that there could even be a possibility" that there was any type of medical issue that would prevent Plaintiff from taking the phone. *Id.*

On September 1, 2023, Mr. White called Plaintiff back into the conference room and again asked Plaintiff to take his turn in the rotation to carry the emergency phone. *Id.* at p. 140. He warned Plaintiff that "your job is very much on the line should you refuse to do so." *Id.* Plaintiff responded that he wasn't going to take the phone, *Id.*, and White informed Plaintiff that he was no longer employed by LBWS. *Id.* at p. 141.

Plaintiff left but subsequently stormed back to the front door of Mr. White's work area, yelling and screaming, cursing and calling him "every name in the book," with 10-12 coworkers present. *Id.* at p. 142. Yet again, Plaintiff did not bring up anything about the need for an accommodation, or medical issues with his children (and never did). *Id.* at pp. 142, 151, 153.

Mr. White memorialized the termination in a 12:23pm email to Sarah Romansik. *Id.* at p. 146; *see also J-11* (attached). White wrote that he terminated Plaintiff because he was asked to take the emergency phone and he continued to refuse to do so. *Id.* at p. 146. As per White, it was textbook insubordination, which was the sole reason for the termination. *Id.* at p. 152.

Plaintiff was not given a written warning, or performance improvement plan, and Mr. White did not start an investigation with HR into Plaintiff's refusal to accept the phone. *Id.* at p. 149. The foregoing were not required because they applied to performance-based issues, and this was insubordination. *Id.* It was within White's discretion with the help of Human Resources, to select the form of discipline of an employee depending on the situation. *Id.* at p. 150.

5. <u>Sarah Romansik Testimony</u>.

She is LBWS's Director of Human Resources. *Id.* at p. 154. She would have had contact with Plaintiff upon his hiring. *Id.* at p. 155. She has no recollection of Plaintiff discussing, during onboarding, any special medical needs for his children. *Id.* She had no recollection of Plaintiff ever asking for reasonable accommodations for himself or his children. *Id.* at p. 156.

She indicated that the purpose of a job description is not to list every conceivable duty that an employee is going to have. *Id.* at p. 159. A job description is supposed to provide an overview of what the job duty is but every job description has a bullet that says, "whatever it takes to get the job done." *Id.*

During her phone conversation with Mr. White on September 1st, he did not say Plaintiff had requested reasonable accommodations, or that there was any type of issue with Plaintiff's children and their medical needs. *Id.* at pp. 160, 166-167. She told him to give Plaintiff another chance and let him know that if he continued to refuse phone duty rotation, he would lose his job for insubordination. *Id.* at p. 160. She felt White was within his discretion to terminate Plaintiff. *Id.* He needed her approval to fire Plaintiff. *Id.* at p. 166

Mr. White called her immediately after termination, which she advised to put in writing. *Id.* at p. 161. White sent an email documenting the phone call. *Id.* at pp. 161, 168; *see also J-11.*

She also communicated with Plaintiff on September 1st. He informed her that he had been fired and asked how he could get his job back. *Id.* at p. 161. She told him that she was sorry but it sounded like "you continued to refuse carrying the cell phone." *Id.* During the phone call, Plaintiff did not mention anything about his children, his children's disabilities, or any type of accommodation his children would supposedly need. *Id.* She thought this interesting since he knew that her son had autism. *Id.* She had no information that the termination had anything to do with Plaintiff's children, their disabilities, or their medical needs, or any accommodation to do the phone assignment. *Id.* at pp. 161-162. In fact, in the September 1, 2023 email from Plaintiff, he referenced wanting to get his job back but did not mention anything about the circumstances of his termination or anything about reasonable accommodations. *Id.* at pp. 163-164; *J-14.*

Plaintiff got no written warning but he was verbally warned about the situation numerous times. *Id.* at p. 170. She indicated that Mr. White indicated that his refusals went on for two days, and were the definition of insubordination. *Id.*

Under LBWS's accommodation policy, *see J-2* (attached), an employee doesn't need to use magic words to request an accommodation, and that if an employee explains medical or

family limitations, Human Resources is expected to engage in an interactive process. *Id.* at p. 170. Ms. Romansik said no interactive process was ever initiated with Plaintiff because there was no need to – "he didn't bring anything up. I had no idea." *Id.* at p. 171.

Once the decision to terminate Plaintiff was made, there was no basis to reconsider. *Id.* at p. 174. In the September 1, 2023 email, Plaintiff did not offer to take the emergency phone. *Id.*

6. Rochelle Collier.

Ms. Collier, Plaintiff's mother-in-law testified that, before he lost his job, he was always a confident, comfortable person. *Doc. 61*, at p. 25. She stated that he's intelligent, a good father to his children, who never raises his voice, who's kind, and helps her. *Id.* She indicated that, after he lost his job, he just was different – he was more unhappy and gained a lot of weight. *Id.* at pp. 25-26. She said that, today, he is better than he was but still not fully himself. *Id.* at p. 26.

She is not a doctor, not a psychiatrist or psychologist. *Id.* at p. 28. She has not diagnosed Plaintiff with any mental health or physical medical condition, and could not. *Id.* at p. 29.[2]

*Standards of Review*

LBWS hereby incorporates by reference the "Standards of Review" recited in its post-judgment motions, filed concurrently herewith, as if fully restated herein.

*Questions Involved*

A. Should this Court grant LBWS's motion for judgment as a matter of law under Fed. R. Civ. P. 50(b), 59(e), and 60(b)(6), with alternative or joint request for a new trial under Fed. R. Civ. P. 59(a), 59(e), on the basis that Plaintiff failed to present sufficient evidence supporting his ADA/PHRA disability discrimination and retaliation claims?

[2] Plaintiff also read Interrogatory Answers into the record but this evidence was merely duplicative of the above-witnesses' testimony. *See Doc. 61*, at pp. 34-36.

B. Should this Court grant LBWS's motion for a new trial on damages or, in the alternative, a remittitur, under Fed. R. Civ. P. 59(a), 59(e), and 60(b)(6), based upon the unfairness and excessiveness of the jury's verdict in favor of Plaintiff?

C. Should this Court grant LBWS's motion for a new trial, under Fed. R. Civ. P. 59(a), 59(e), because the jury's verdict was against the weight of the evidence?

Suggested Answers: Yes.

*Argument*

**A. LBWS is entitled to judgment as a matter of law under Fed. R. Civ. P. 50(b), 59(e), or 60(b)(6), or, in the alternative, a new trial under Fed. R. Civ. P. 59(a), 59(e), on the basis that Plaintiff failed to present sufficient evidence at summary judgment, as well as at trial, in support of his ADA/PHRA disability discrimination and retaliation claims.[3]**

Judgment as a matter of law should be entered in LBWS's favor. No reasonable jury could have concluded that LBWS was liable to Plaintiff for ADA/PHRA[4] disability discrimination or retaliation.

*Insufficient Evidence of ADA/PHRA Associational Discrimination*

Plaintiff contends that LBWS took adverse action against him because of his known relationship with his two disabled children. *Doc. 28*, at p. 5 of 11. The ADA's association provision prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of

[3] This issue was preserved at trial where LBWS requested judgment on lack of evidence supporting causation and pretext. *See Doc. 61*, at pp. 37, 49-50, 89. It was also preserved in LBWS's summary judgment documents. *See Docs. 18-2 & 21. See also Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC*, 784 F.3d 177, 185 (3d Cir. 2015) (citations omitted) ("[A]n order denying summary judgment on 'a purely legal issue' capable of resolution 'with reference only to undisputed facts,' " is reviewable on appeal even if not raised and renewed by proper motions for judgment as a matter of law under Federal Rule of Civil Procedure 50).
[4] The ADA/PHRA claims are decided under the same standards. *Rinehimer v. Cemcolift*, 292 F.3d 375, 382 (3d Cir. 2002) ("The PHRA is basically the same as the ADA in relevant aspects and Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts.") (internal quotations omitted)).

the known disability of an individual with whom the qualified individual is known to have a relationship or association." *42 U.S.C. § 12112(b)(4)*. To prove associational disability discrimination, however, a plaintiff must show that: "(1) she was 'qualified' for her job at the time of the adverse employment action; (2) she was subjected to adverse employment action; (3) her employer knew at the time that she had a relative or associate with a disability; and (4) the adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Douglas v. Kensington Cmty. Corp. for Individual Dignity*, 775 F. Supp. 3d 881, 901 (E.D. Pa. 2025) (citing *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1085 (10th Cir. 1997)).

As argued on summary judgment, and raised again now, the ADA's association provision does not obligate employers to accommodate the schedule of an employee with a disabled relative. *See Doc. 18-2*, at pp. 9-10 of 19; *Doc. 21*, at p. 5 of 8. Although refusal to "mak[e] reasonable accommodations" may constitute illegal discrimination against a *disabled employee*, *42 U.S.C. § 12112(b)(5)*, the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled. *See 29 C.F.R. § 1630.8*, *Appendix* ("It should be noted, however, that an employer need not provide the applicant or employee without a disability with a reasonable accommodation because that duty only applies to qualified applicants or employees with disabilities."). *See also Den Hartog*, 129 F.3d at 1084 ("[T]he plain language of [§§ 12112(b)(5)(A) and (B)] – the only two provisions requiring 'reasonable accommodation' in Title I of the ADA – suggests that only job applicants or employees, but not their relatives or associates, need be reasonably accommodated."); *Larimer v. IBM*, 370 F.3d 698, 700 (7th Cir. 2005) ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person.") (citing *Den Hartog, supra*); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Ca.*, 31 F.3d 209,

214 (4th Cir. 1994) (*stating that "[t]he ADA does not require an employer to restructure an employee's* work schedule to enable the employee to care for a relative with a disability.").

The question is, therefore, whether Plaintiff has ever adduced sufficient evidence from which a reasonable jury could infer that LBWS terminated him because of his children's disabilities. Under the association provision, there is a material distinction between firing an employee because of a relative's disability and firing an employee because of the need to take time off or carve out time to care for the relative, which is exactly what the facts contemplate here. The ADA statute refers to adverse employment actions motivated by "the known disability of an individual" with whom an employee associates, as opposed to actions occasioned by the association. As such, Plaintiff was required to show that LBWS was motivated by the children's disabilities rather than by Plaintiff's stated intention to "miss work" or, more specifically, his inability to make time to handle the emergency phone; in other words, that *he would not have been fired if he had requested time off for a different reason.*[5] *See Den Hartog*, 129 F.3d at 1085 (requiring association provision plaintiffs to show that an "adverse employment action occurred under circumstances raising a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision"); *Id.* at 1083 (quoting H.R. Rep. No. 101-485, pt. 2, at 61-62 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 344)) (recognizing that dismissal for absence or tardiness is not actionable "even if the reason for the absence or tardiness is to care for [a disabled relative]").

Other courts have surmised that an employee would be protected by the association provision if she were fired because her employer feared that she might miss work to care for a disabled relative

---

[5] No reasonable inference exists on this record that if Plaintiff had said he couldn't take the emergency phone because he goes to bed by 7:00 pm, or works another job at night, that he still would not have been fired for insubordination. The record shows that he was fired for refusing to handle the emergency phone duty regardless of the reason. The associational discrimination claim was meritless.

even though she had not, herself, taken or requested time off. *See Oliveras-Sifre v. Puerto Rico Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000) ("[The association provision prohibits termination] based on 'unfounded stereotypes and assumptions' arising from the employee's relationships with particular disabled persons.") (quoting *Barker v. Int'l Paper Co.*, 993 F. Supp. 10, 15 (D. Me. 1998)); *Tyndall*, 31 F.3d at 214 (noting that termination "based on any assumption regarding future absences related to [a relative's] care" gives rise to liability, but that termination "result[ing] from [an employee's] record of past absences and [her] clear indication that she needed additional time off" does not). The Third Circuit has held that this view comports with the language of the statute, because a decision motivated by unfounded stereotypes or assumptions about the need to care for a disabled person may be fairly construed as "because of the . . . disability" itself. *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 511 (3d Cir. 2009) (citing *42 U.S.C. § 12112(b)(4)* and *29 C.F.R. § 1630.8*, *Appendix* (noting that the association provision prohibits an employer from refusing to hire a job applicant because of the employer's unfounded belief "that the applicant would have to miss work or frequently leave work early in order to care for [a disabled] spouse")); *Tyson v. Access Services*, 158 F. Supp. 3d 309, 314 (E.D. Pa. 2016) (to establish associational discrimination claim, adverse decision must be based on unfounded stereotypes and assumptions arising from employee's relationship with disabled person).

In this case, the record is devoid of evidence indicating that LBWS's decision to fire Plaintiff was motivated by unfounded stereotypes and assumptions about his children's disabilities. Indeed, according to Plaintiff, LBWS was aware of his children's disabilities for years before he was fired (in fact, when he was hired), and that they had accommodated his request for a modified schedule on Tuesdays so he could take his disabled daughter to necessary therapy. The most Plaintiff has shown is that he was fired for failing to agree to take the emergency phone because he feared it would interfere with his ability to care for his kids, not because of unfounded stereotypes or assumptions on LBWS's

part about care required by disabled persons. Even if the reason for his failure to take the emergency phone was to preserve time for his children, it was still permissible for LBWS to fire him for refusing it. *See Den Hartog*, 129 F.3d at 1083 (recognizing that dismissal for absence or tardiness is not actionable "even if the reason for the absence or tardiness is to care for [a disabled relative]")).

*Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011 (8th Cir. 2005) further illustrates that the evidence here was insufficient to establish ADA associational discrimination. There, the Eighth Circuit held that an exemplary employee who was fired while on maternity leave to care for her disabled newborn could state an ADA claim on an association theory. However, this case substantially differs from *Strate*. In that case, Strate's employer was overheard implying that her newborn's disability was a factor justifying termination. *Id.* at 1014. Additionally, *Strate* relied heavily on the "close temporal connection" between the employer's discovery of the child's disability and Strate's termination. *Id.* at 1019. To the contrary, in this case, Plaintiff testified that LBWS knew of his children's disabilities at the time he was hired, years before Plaintiff's termination. Most importantly, the employer's motivations in *Strate* amounted to unfounded assumptions about the need to care for a disabled child because although the employer knew about the disability, *it had no reason to suspect* that Strate would need additional time off beyond her originally scheduled maternity leave. Again, just the opposite here, where Plaintiff was fired only after stating that he would not take the emergency phone because there was not going to be a rotation of the phone duties, which could possibly affect his ability to care for his children and the time needed to do so.

Accordingly, *Strate* counsels against holding that a reasonable juror could find associational discrimination under the ADA, that Plaintiff was fired "because of [children's] known disabilit[ies]," *42 U.S.C. § 12112(b)(4)*, and instead indicates that judgment should have been and should be entered in LBWS's favor. *See also Erdman*, 582 F.3d at 510-511 (Third Circuit affirmed district court's

grant of summary judgment in favor of employer on ADA associational discrimination claim where the plaintiff alleged she had been terminated because of her daughter's disability, holding that the record was completely devoid of evidence indicating that the employer's decision to fire her was motivated by the disability itself, as the employer had been aware of the daughter's disability for many years prior to the termination and the plaintiff merely showed was that she was fired for requesting time off, rather than because of unfounded stereotypes or assumptions by the employer regarding the care required by disabled persons, and because dismissal for absence or schedule modifications was not actionable under the ADA's association provision – which does not obligate employers to accommodate the schedule of a non-disabled employee); *Scott v. Allied Waste Serv. of Bucks-Mont*, 2010 U.S. Dist. LEXIS 136202, *17-18 (E.D. Pa. Dec. 23, 2010) (holding employee was required to demonstrate that employer was motivated by his son's disability rather than by employee's "stated intention to miss work; in other words, that [he] would not have been fired if [he] had requested time off for a different reason," which he failed to do, as there was no evidence that employee was terminated based on "unfounded stereotypes and assumptions" and record indicated that employer was aware of employee's son's disability since he was hired and had granted him time off to attend to his son on multiple occasions); *Tucker v. Concrete*, 2024 U.S. Dist. LEXIS 63222, at *26-30 (D.N.J. April 5, 2024) (granting summary judgment in favor of defendant on associational disability discrimination claims because evidence could only show plaintiff was fired for absenteeism, not because of unfounded stereotypes or assumptions about the care required by plaintiff's disabled son).

*Insufficient Evidence of Pretext*

As noted, if LBWS was singling Plaintiff out for his refusal to take the emergency phone in order to preserve time to care for his children, rather than for their disabilities, there is no

supportable claim for associational disability discrimination. *See Erdman*, 582 F.3d at 510-511. Nevertheless, assuming *arguendo* Plaintiff established a prima facie ADA/PHRA associational discrimination case, including the causation element (Plaintiff also failed to establish the causation element of her prima facie case, as there is no sufficient evidence suggesting that LBWS terminated Plaintiff because of his children's disabilities), Plaintiff's claims must still fail because the record is devoid of evidence that he was fired for pretextual reasons, rather than for the legitimate reason provided, or, in other words that the articulated reason, namely, Plaintiff's insubordination, was a mere pretext for discrimination.

To satisfy this burden, Plaintiff "must point to some evidence from which a factfinder could reasonably infer that that the children's disabilities "played a role in the decision-making process ... and ... had a determinative effect on the outcome of that process." *Hollingsworth v. R. Home Prop. Mgmt, LLC*, 498 F. Supp. 3d 590 (E.D. Pa. 2020) (quoting *CG v. Pennsylvania Dept. of Educ.*, 734 F.3d 229, 237 & n. 11 (3d Cir. 2013)) (citations omitted). This Court has instructed that, "[i]n contrast to the usually insubstantial burden of establishing causation, which 'is not intended to be onerous,' demonstrating pretext is a more 'difficult burden.'" *Hollingsworth,* 498 F. Supp. 3d at 604 (citations omitted). To meet this burden, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' ... ." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)) (internal citations omitted).

Because LBWS provided a legitimate, non-discriminatory reason for the adverse employment action against Plaintiff, he bore the burden of establishing that this proffered reason was a pretext for discrimination. *Walton v. Mental Health Ass'n of Southeastern Pennsylvania,*

168 F.3d 661, 667-668 (3d Cir. 1999). He did not do so. The reason for Plaintiff's termination was always insubordination. The evidence supports that Plaintiff would have been terminated for insubordination for refusal to take the phone for any reason. In addition, LBWS knew about Plaintiff's children's disabilities at the time he was hired years earlier and, in fact, had accommodated a Tuesday schedule change based on the disability of his daughter. Accordingly, Plaintiff merely has shown that he was fired for seeking to avoid the emergency phone duty and preserve his schedule, his free time to care for his kids, not because of his children's disabilities or any "unfounded stereotypes or assumptions on [LBWS's] part about care required by disabled persons." *Erdman*, 582 F.3d at 511. No pretext was sufficiently supported at trial – further supporting judgment as a matter of law in LBWS's favor.

*Insufficient Evidence of Retaliation under the ADA/PHRA*

Finally, for similar reasons, the retaliation claim also was insufficiently supported at summary judgment and trial. Plaintiff did not establish a prima facie claim of retaliation under the ADA/PHRA. Plaintiff's claim for retaliation under the ADA is based on his alleged engagement in a "protected activity" by utilizing or requesting his "reasonable accommodation" for his disabled children.

Pursuant to the ADA's retaliation provision: "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *42 U.S.C. § 12203(a).* To establish a prima facie case of retaliation pursuant to the ADA, a plaintiff must show: "(1) the employee engaged *in a protected employee activity*; (2) the employer took an adverse employment action after or contemporaneous with the *employee's protected activity*; and (3) a causal link exists

between the *employee's protected activity* and the employer's adverse action." *Abramson v. William Patterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001) (emphasis added).

An employee's request for an accommodation for *his disability* is a protected activity for the purposes of § 12203(a). *Shellenberger v. Summit Bancorp., Inc.*, 318 F.2d 183, 191 (3d Cir. 2003); *Merit v. SEPTA*, 315 F. Supp. 2d 689, 705 (E.D. Pa. 2004). Although a request for an accommodation for one's own disability is a protected activity, "the plain language of the ADA indicates that the accommodation requirement does not extend to relatives of the disabled." *Erdman*, 582 F.3d at 510 (citing *29 C.F.R. § 1630.8, Appendix* (Employer need only provide reasonable accommodation "to qualified applicants or employees with disabilities."); *42 U.S.C. § 12112(b)(4)*.

Here, no sufficient evidence shows that Plaintiff was retaliated against for his own reasonable accommodation. Because the ADA does not require LBWS to accommodate Plaintiff to care for his children, Plaintiff has no claim under retaliation since he did not engage in a protected activity[6] in requesting such accommodation. *Erdman*, 582 F.3d at 510; *Kennedy v. Chubb Grp. Of Ins. Co.*, 60 F. Supp. 2d 384, 396 (D.N.J. 1999) (finding § 12112(b)(4) does not mandate that an employer provide an employee without a disability with a reasonable accommodation to enable the employee to care for a disabled individual with whom the employee is associated and "that the ADA does not require [an employer] to allow plaintiff to continue to work part time because her request in that regard is necessitated by her need to care for her disabled son"); *42 U.S.C. § 12203(a)*. Consequently, judgment should have been and should be entered in favor of LBWS.

---

[6] This argument was previously raised on summary judgment. *See Doc. 18-2*, at p. 10 of 19.

Further, there was no sufficient evidence that anyone possessed retaliatory animus toward Plaintiff, who was unquestionably fired because of insubordination for refusing to take the emergency phone. He could have failed to take the phone for any other reason and would still have been fired. No retaliation for attempting to gain an accommodation for his kids was shown.

**B. *This Court should grant* LBWS's *motion for a new trial on damages or, in the* alternative, a remittitur, under Fed. R. Civ. P. 59(a), 59(e), and 60(b)(6), based upon the unfairness and excessiveness of the jury's verdict in favor of Plaintiff.**

The verdict slip in this matter indicates that the jury awarded $510,000 in compensatory damages for "pain, suffering, inconvenience, mental anguish, or loss of enjoyment of life," *Doc. 61*, at p. 128, allegedly resulting from his termination because of LBWS's alleged ADA/PHRA discrimination/retaliation. This amount is excessive, speculative, and irrational, and either a new trial on damages or a substantial remittitur should be granted.

Courts have an obligation "to ensure that the compensatory damage award finds support in the record and that the jury did not 'abandon analysis for sympathy.'" *Evans v. Port Auth.*, 273 F.3d 346, 352 (3d Cir. 2001) (quoting *Gumbs v. Pueblo In'tl, Inc.*, 823 F.2d 768, 773 (3d Cir. 1987)). Remittitur is proper where no clear judicial error or "pernicious influence" can be identified, but where the verdict is so large as to shock the conscience of the court. *Kazan v. Wolinski*, 721 F.2d 911, 914 (3d Cir. 1983). Upon finding that a damages award is unreasonably high, a court has two options. It may either reverse the jury award and order a new trial or it may allow the plaintiff the option of remitting the award to a specified amount. *IPPV Enters., LLC v. Echostar Communs. Corp.*, 191 F. Supp. 2d 530, 572-573 (D. Del. 2002) (citing *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995)).

In the Third Circuit, a remittitur is properly granted when a jury's award of compensatory damages for pain and suffering – including emotional distress and loss of life's pleasures – is

speculative, unsupported by the record, or excessive. *Evans*, 273 F.3d at 352; *Spence v. Board of Education*, 806 F.2d 1198, 1201 (3d Cir. 1986). Because general compensatory damages for emotional distress cannot be presumed, a plaintiff must present competent evidence of actual injury. *See Spence*, 806 F.2d at 1201 (district court properly ordered remittitur, in part, because "Plaintiff offered no evidence that she suffered physically from her emotional distress or that she sought professional psychiatric counselling."); *see also Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108, 1121 (3d Cir. 1988) (citing cases) ("The plaintiff must present evidence of actual injury, however, before recovering compensatory damages for mental distress.").

While a plaintiff is not required to provide expert medical testimony to corroborate a claim for emotional distress *Bolden v. SEPTA*, 21 F.3d 29, 34 (3d Cir. 1994); *Delli Santi v. CNA Ins. Cos.*, 88 F.3d 192, 205 (3d Cir. 1996), the district court must still ensure the award finds support in the record. *Spence*, 806 F.2d at 1201. "[A] plaintiff must show 'a reasonable probability rather than a mere possibility that damages due to emotional distress were in fact incurred [as a result of an unlawful act].'" *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002) (citing *Spence*, 806 F.2d at 1201). Where the evidence of emotional distress is vague, speculative, or consists of thin, subjective testimony with limited quality and quantity of proof, courts in the Third Circuit will grant a remittitur.[7] *See e.g. Spence*, 806 F.2d at 1201 (district court did not err in finding that evidence was too speculative to support $22,060 award of emotional distress damages when evidence of emotional distress consisted chiefly of plaintiff's own testimony that she was depressed and humiliated by transfer and that she lost her

---

[7] When considering and fixing a remittitur, the court may "consider similar cases, evaluate the evidence, determine a damages figure related to that evidence, while being mindful that the determination of that amount may not be precisely calculated." *Evans*, 273 F 3d at 352 (citing *Blakey v. Continental Airlines, Inc.*, 992 F. Supp. 731, 739 (3d Cir. 1998)).

motive to be creative, when there was no testimony that plaintiff's peers held her in any less esteem, and when Plaintiff offered no evidence that she suffered physically from her emotional distress or that she sought professional psychiatric counselling); *Gunby*, 840 F.2d at 1121 (Third Circuit reversed an award of $15,000 as compensation for emotional distress, finding the evidence insufficient, as the only evidence supporting the award consisted of the plaintiff's testimony that he was "very upset," felt he "had been done wrong" and thought he "had been treated unfairly" in being passed over for a promotion).

Other courts in similar cases have also reduced awards for damages for emotional distress and pain and suffering. In *Dee v. Borough of Dunmore*, 2010 U.S. Dist. LEXIS 39166 (M.D. Pa. Apr. 21, 2010), aff'd, 474 F. App'x 85 (3d Cir. April 6, 2012), the plaintiff testified he felt humiliated and emotionally devastated and suffered from high blood pressure after he was transferred to a less prestigious position in retaliation for his speech. 2010 U.S. Dist. LEXIS 39166, at *4, 24-25. The jury awarded the plaintiff $150,000.00 in compensatory damages for the violation of his procedural due process rights. 2010 U.S. Dist. LEXIS 39166, at *4, 17. The award was ordered remitted to $50,000.00 because there was no evidence the plaintiff was changed in any lasting way and suffered no other non-economic injury or loss of reputation among his peers. 2010 U.S. Dist. LEXIS 39166, at *24-25.

In *Glass v. Snellbaker*, 2008 U.S. Dist. LEXIS 71241 (D.N.J. Sept. 17, 2008), the plaintiff sought emotional distress damages under his claim for first amendment retaliation. *Glass*, 2008 U.S. Dist. LEXIS 71241, at *3. Plaintiff was the Deputy Chief in charge of the Special Operations Division of the Atlantic City Police Department overseeing the SWAT team, vice squad, and tactical team. *Id.* at *4. In retaliation for his speech, plaintiff was transferred out of this prestigious position and was placed in charge of the Support Services. *Id.* at *5. The jury

awarded $250,000 for mental and emotional harm, along with additional damages for lost wages and benefits. *Id.* at *11. In support of this award, plaintiff testified that as a result of the constitutional violation he felt humiliated and emotionally devastated. *Id.* at *72. There was also evidence that plaintiff was prescribed additional medication to control his pre-existing high blood pressure, and that plaintiff was told that the elevation of blood pressure was due to stress. *Id.* at *75. There was no evidence, however, that he suffered any lasting emotional distress or other non-economic injury. *Id.* Plaintiff continued going to work as before the transfer and reported no changes in sleep habits or other emotional effects. *Id.* The evidence also did not demonstrate any immediate financial stress on the plaintiff because his salary and benefits remained unchanged. *Id.* And despite the potential for harm to plaintiff's reputation, the evidence at trial demonstrated that plaintiff's reputation in the police department did not suffer. *Id.* at *76. In light of this evidence, the district court held that the jury's award of $ 250,000 was shocking to the judicial conscience, and determined that $50,000 was the highest amount supported by the evidence. *Id.* at *80.

In *Abrams v. Lightolier, Inc.*, 841 F. Supp. 584 (D.N.J. 1994), a New Jersey Law Against Discrimination employment action, the jury awarded the plaintiff $100,000 for emotional distress based on thin testimony that being accused of bribery and being told he was not up to a job physically was "upsetting," "unpleasant," and "distressing." *Id.*, 841 F. Supp. at 586, 593-594. The district court ordered a remittitur of the award to $2,500 due to the "paucity of evidence regarding plaintiff's actual mental distress," *Id.* at 594, a decision later referenced and relied upon by the Third Circuit in *Delli Santi*, *supra*.

In *Delli Santi*, an employment action that was also brought under the NJLAD, the jury awarded the plaintiff $300,000 for pain and suffering. *Id.*, 88 F.3d at 196, 198. The plaintiff

testified that she was "terrified" to interview with prospective employers, "afraid" to network, and that her social life had nearly ceased to exist due to the humiliation of her firing. *Id.* at 206. The district court determined that the evidence did not support an award of that size and conditionally granted a new trial unless the plaintiff accepted a remittitur of the pain and suffering award from $300,000 to $5,000. *Id.* at 206-207. Relying on the deference owed to the trial court in evaluating the evidence, the Third Circuit held that the district court did not abuse its discretion in ordering the remittitur. *Id.*

The common thread among these cases is that, where the evidence of actual harm is threadbare, or where there has been no evidence of life-altering change or that the plaintiff was changed or actually harmed in any lasting way, courts have been willing and able to remit excessive verdicts. *But see Evans*, 273 F.3d at 354-356 (substantial remitted award of $375,000 in race discrimination case was upheld because the plaintiff's emotional distress was supported by dramatic trial demeanor, testimony regarding the physical and emotional toll on her family life, and the enduring impact of being forced to train the very people who were promoted over her, and testimony from several Port Authority witnesses). The evidence in this case is similarly bare and showed no significant actual harm or lasting effects from the termination.

Here, the only evidence of non-economic damages was the testimony offered by Plaintiff's wife, Saresa Rideout, and mother in law, Rochelle Collier, which, at best, was scant and vague. To wit, Plaintiff's wife stated that, after Plaintiff was fired, he became withdrawn and pessimistic about making decisions, and slept more. *Doc. 60*, at p. 106. She noted that Plaintiff is better today but still has a tendency to "weigh his options," is still pessimistic, and "[i]f talking about something big," Plaintiff will not want to do it if there is a negative aspect. *Id.* at p. 107. Plaintiff's mother-in-law offered little more, stating that, after Plaintiff lost his job, he just was

different – he was more unhappy and gained a lot of weight. *Id.* at pp. 25-26. She said that, today, he is better than he was but still not fully himself. *Id.* at p. 26.

This testimony, which, at best, showed that Plaintiff suffered some temporary unhappiness and change in sleep habits after the firing but is better today, did not support a $510,000 award. Plaintiff sought no medical, psychiatric, or psychological treatment. He was prescribed no medication. There was no indication that his blood pressure was unhealthy, that or that he suffered any substantial or immediate physical harm normally associated with and required to establish non-speculative emotional distress damages. *Cf. Runner v. C.R. Bard, Inc.*, 108 F. Supp. 3d 261, 273 (E.D. Pa. 2015) (to prove emotional distress under Pennsylvania law, disturbance must be beyond "transitory, nonrecurring physical phenomena, harmless in themselves" and the equivalent to physical harm that "may be classified by the courts as illness, notwithstanding their mental character.") (citations omitted). No evidence that his reputation was harmed was offered. No permanent harm to Plaintiff was presented. Only vague statements.

It is noteworthy that Plaintiff appeared as upset by his own behavior after the firing, which he felt the need to apologize for, as the firing and conduct of LBWS itself. *See Doc. 60*, at pp. 71-73, 95; *J-14*. Plaintiff has not shown a reasonable probability but, insufficiently, a mere possibility of emotional distress damages and actual injury. *Gagliardo*, 311 F.3d at 573.

For these reasons, the record supports that the non-economic, compensatory damage award was excessive, not rationally based on the evidence, and extended beyond reasonable grounds. The award was utilized by the jury, in disregard of the Court's instructions, to punish LBWS out of sympathy for Plaintiff and his children and their disabling conditions, and not due to any rational relation to the evidence at trial, which was thin, vague, and speculative.

Consequently, the jury's verdict was shocking and the jury's verdict should be vacated with a new trial[8] granted as to damages pursuant to Fed. R. Civ. P. 59(a), 59(e) or 60(b)(6). In the alternative, the verdict should be remitted to a reasonable amount comporting with the evidence, which amount should not be significant and certainly less than $100,000, and, perhaps, should be something nominal. *See Delli Santi*; *Spence*; *Gunby*; *Dee*; *Glass*; *Abrams*.

**C. This Court should grant LBWS's motion for a new trial, under Fed. R. Civ. P. 59(a), 59(e), because the jury's verdict was against the weight of the evidence.**

*The Great Weight of the Evidence Calls for a New Trial.*

Alternatively, for the same reasons discussed above in *Section A*, including but not limited to facts showing that LBWS hired Plaintiff knowing of his children's disabilities, that LBWS had previously granted Plaintiff a continuing schedule accommodation so he could take his disabled daughter to needed therapy on Tuesdays, that Plaintiff wanted more money to take the emergency phone duty, that Plaintiff was fired because of insubordination for refusal to take the emergency phone due to his belief that it would affect the time available to, and his ability to, care for his children, that he would have been fired if he had refused to take the emergency phone duty for any reason, and that he was not fired because of his children's disabilities, the Judgment entered in Plaintiff's favor also was a miscarriage of justice contrary to the great weight of the evidence. *See Williamson v. Conrail*, 926 F.2d 1344, 1353 (3d Cir. 1991) (discussing standard). He was not discriminated against. He was also not retaliated against, as, in addition to the fact that he was not fired because of his children's disabilities, he merely had requested an accommodation for his children and, therefore, engaged in no protected activity under the ADA/PHRA. Finally, the evidence shows that, not until days after his termination, did

---

[8] The evidence available may be too speculative to warrant a new trial as to damages.

Plaintiff offer anything that indicated that his firing was related somehow to his children's disabilities. His after-the-fact reference to those disabilities weighs heavily against his claims.

Considering the above, the jury's verdict is shocking. Therefore, in the alternative, pursuant to Fed. R. Civ. P. 59(a)(1)(A) and 59(e), the jury's verdict and the August 14, 2026 Judgment should be vacated and reversed, and LBWS should be granted a new trial.

*Conclusion*

For all of the foregoing reasons, this Honorable Court should grant LBWS's post-judgment motions and grant LBWS's motion(s) for judgment as a matter of law, vacating and reversing the jury's verdict and the August 14, 2026 Judgment, and entering Judgment in its favor. In the alternative, LBWS requests that this Court vacate and reverse the verdict and the judgment and grant LBWS a new trial. In the alternative, LBWS respectfully requests that this Court grant LBWS a new trial on damages or, in the alternative, a substantial remittitur, amending and reducing the judgment and entering an amended judgment in a reasonable amount.

Respectfully submitted,


| | |
|---|---|
| **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>*/s/ Christopher J. Conrad*<br>Christopher J. Conrad, Esquire<br>PA Atty. I.D. No. 202348<br>Daniel P. McGannon, Esquire<br>PA Atty. I.D. No. 309357<br><br>200 Corporate Center Drive, Suite 300<br>Camp Hill, PA 17011<br>Ph: (717) 651-3531/(717) 651-3717<br>Fax: (717) 651-3707<br>Email: cjconrad@mdwcg.com<br>dpmcgannon@mdwcg.com | **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>*/s/ Thomas A. Specht*<br>Thomas A. Specht<br>PA Atty. I.D. No.: 78686<br>Suzanne T. Tighe<br>PA Atty. I.D. No.: 80179<br><br>P.O. Box 3118<br>Scranton, PA 18505-3118<br>Ph: (570) 496-4600<br>Fax: (570) 496-0567<br>Email: taspecht@mdwcg.com<br>sttighe@mdwcg.com |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JONATHAN RIDEOUT, Plaintiff, | : | |
| | : | NO. 5:25-cv-04766-JMG |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| LB WATER SERVICES, INC., Defendant. | : | ELECTRONICALLY FILED |

**EXHIBITS TO DEFENDANT, LB WATER SERVICES, INC.'S POST-JUDGMENT MOTIONS**

1. J-14 – September 1, 2023 (12:20pm) Email from Plaintiff to Sarah Romansik;
2. D-1 – Plaintiff's Texts to Troy Dressler;
3. J-13 – September 1, 2023 Termination Letter;
4. D-2 – Plaintiff's September 4, 2023 Email;
5. J-7 – LBWS Discipline Guide;
6. J-11 – September 1, 2023 (12:23pm) Email from Adam White to Sarah Romansik; and
7. J-2 – LBWS Accommodation Policy.


| | |
|---|---|
| **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>Christopher J. Conrad, Esquire<br>PA Atty. I.D. No. 202348<br>Daniel P. McGannon, Esquire<br>PA Atty. I.D. No. 309357<br><br>200 Corporate Center Drive, Suite 300<br>Camp Hill, PA 17011<br>Ph: (717) 651-3531/(717) 651-3717<br>Fax: (717) 651-3707<br>Email: cjconrad@mdwcg.com<br>dpmcgannon@mdwcg.com | **MARSHALL DENNEHEY, P.C.**<br>*Counsel for Defendant LBWS*<br><br>Thomas A. Specht<br>PA Atty. I.D. No.: 78686<br>Suzanne T. Tighe<br>PA Atty. I.D. No.: 80179<br><br>P.O. Box 3118<br>Scranton, PA 18505-3118<br>Ph: (570) 496-4600<br>Fax: (570) 496-0567<br>Email: taspecht@mdwcg.com<br>sttighe@mdwcg.com |

1.

**Sarah Romansik**

---

**From:** Jonathan Rideout <mrjohnride@gmail.com>
**Sent:** Friday, September 1, 2023 12:20 PM
**To:** Sarah Romansik
**Subject:** I'm sorry

I apologize for my actions while you were on the phone. That was completely out of character for me. The fact that I was fired over manager lying on my. You have always been great and I hate you had to see me in that light.

**Caution:** This email originated from outside the LB Network. Please be very careful when clicking links or opening attachments. If you have any doubt, contact the sender and verify its legitimacy or contact the IT Department.



J-14

②

Hey Troy, sorry to keep bothering you. When you get a chance could you please give me a call? Thank you

Yeah sorry on the phone, typing on my ipad

Just when you got a chance.

Troy, please don't forget to call me today. It's pretty important

From our conversation before you told me that if I was fired I wouldn't have to pay the CDL back. Well I was fired just making sure I'm not required to pay that back.

Jonathan I will not be calling you back regarding todays events

I just need to know about the CDL. That's all.

Right now I don't have an answer

Other things are broken now too

What's broken?

Tablet

Sorry things went that direction. Just let me know what I need to do. I appreciate you and Lb this was out of character for me. Stress got the better. Just reach out when you get in the office next week and we'll talk about making the table right.

D-1

3

LB Water™
We Make Water Work.

ESOP 100% EMPLOYEE OWNED

September 1, 2023

Johnathan Rideout-

Your employment with LB Water Service, Inc has been terminated effective September 1, 2023. Pennsylvania is an At-Will State.

Please note the following:

- Final paycheck: September 8, 2023
- Health Benefit Premiums
    - Any health benefits you have with LB Water will end on September 30, 2023. You may note some of your payroll deductions may be different from your normal payroll checks due to balancing out payroll deductions for voluntary insurances. These changes may add or deduct from your net pay as the full month premiums need to be considered.
- Insurance Continuation:

    In accordance with the Consolidated Omnibus Budget Reconciliation Act (COBRA) of 1986, you will receive a notice in which you may elect to continue medical coverage. You will be responsible for paying the full amount of coverage, including a 2% administrative fee. Detailed information regarding COBRA will be sent to you under separate cover from our third-party administrator, Gunn Mowery.

    Though the COBRA coverage is the same health coverage as you have now, COBRA premiums can be costly, because you are paying 102% of the premiums. It is recommended, if you need to elect continuation of health coverage, you look into the exchange program for health benefits (Affordable Care Act) because that may be more cost effective than COBRA. https://www.healthcare.gov/

Corporate Office: SELINSGROVE, PA 570.374.2355 | Sales Offices: CHAMBERSBURG, PA 717.264.8445 | EBENSBURG, PA 814.471.1980 | EPHRATA, PA 717.738.0389 | FREDERICK, MD 301.874.2560 | PITTSBURGH, PA 724.695.2255 | QUAKERTOWN, PA 267.875.2058 | RICHMOND, VA 804.717.2377 | SELINSGROVE, PA 570.374.1157 | STONEBORO, PA 724.376.4525 | VIRGINIA BEACH, VA 757.500.5322

www.lbh2o.com

LB Water™
We Make Water Work.

ESOP 100% EMPLOYEE OWNED

- LB Water 401(k)

  If you have contributed to the 401k plan, you have the option to transfer this to another qualified retirement plan or to withdraw the money. Please note that there may be income tax and penalties due if you cash out of the plan. Account balances of less than $5000 will be closed out prior to the end of the plan year, March 31st. The contact is through their website: www.principal.com You may initiate the process of your 401k **after** your final paycheck with LB so that all contributions are processed.

If you have any questions, please contact me at 570-374-2355 or Sarah.Romansik@lbh2o.com

Sincerely,

Sarah Romansik

Sarah Romansik
Director of Human Resources

4.

**Sarah Romansik**

**From:** Jonathan Rideout
**Sent:** Monday, September 4, 2023 1:56 PM
**To:** Troy Dressler; Sarah Romansik; Jamie Gelvin
**Subject:** My POV

Let me start off by saying that this is not an attempt to get my job back. I came to terms with the fact that I'm unemployed. I just thought that you should have a understanding of things.

My daughter had a stroke and has brain damage. She gets 5 therapys a week. 2 Pt, 2 Ot, and 1 speech.
My son is autistic and get 3 therapys 1 Ot, 1 speech, and 1 Ot with a specialty in eating.

My wife is in college getting her 2nd masters from 6 til 9 Monday through Friday and during the day while the kids are in school she does her internship for her license. Witch means she works for free. Because I'm the sole income for my family I work 2 jobs.

If you look at my life. I'm responsible for 3 out of the 8 therapys for the kids. I take care of my children from the time I get home. Homework food shower and bed. When the go down at 8 I go back out to work. I work almost every week night and Saturday or Sunday depending on family plans. One day is a family day.

I told Adam all this and he strugged his shoulders and told me we all have family problems but I need to do whats best for our customers, and living closet to the job I'm the best to have the phone for response time and consistency for the customers.
I informed him that I have no problems keeping the emergency phone just not being the sole person to keep it. I told him that I have no problem being a team player and being part of the rotation but I'm not going to take one for the team and be the only person to have this responsibility. He told me as as my manager he's telling me I'm going to do it.

I offer him a couple different options such as a salesperson with a laptop at home taking the call, and me finding time to go pull the stuff and putting it on



D-2

the PM shelf. That was not good enough for him. I told him to make the rotation and I will be part of it and he wasn't down for that either. He told me that a rotation is something for down the line but as I'm the person that's going to have the phone. When he wasn't willing to compromise in any way knowing all the circumstances I explained to you guys in the beginning and telling me over and over that he's my manager and he's telling me to do something. That's when I told him I'm not taking the phone.

For the longest time Jerry and I were the rotation. I have no problems doing this task. I've done it for months. I was the only person willing to step up and help Jerry with it with out even being asked when everyone else in the building said them weren't doing it. I did it to be a team player, but when being told I'm the only person that needs to do it now would no help. That's when I put my foot down.

I never told him I didn't want to take that phone. I just told him I couldn't be the only person doing it. He lied to Sarah and Jamie and the lie was accepted and my job was terminated. You can verify what I'm saying about the rotation by simply calling a few guys in the warehouse to see if there's a rotation in motion.

When I was told that the termination was final with no investigation whatsoever. Based off the lies of the manager, I got upset. The reality setting my wife and I are trying to buy a house is stuck on hold for at least a year because you need to work at a job for a year in order to buy a house. Two of my daughter's therapies is gone because they're paid for with our insurance. One of my son is therapy is gone because it's paid for throughout insurance. The main source income for my family is going. And all this is gone based on the lies of one man.

In my interview I was sold on the family values of LB Water but as a Friday I see that those values were not true when it came to my family no one cared about them.

I do regret my actions my last 2 minutes in the building. Those were not my intentions but when I seen him I realize he single-handedly set everything that my wife and I have been working on at least one year behind with one lie.

I do appreciate my time at LB Water. I learned a lot about the industry I never had any ideas about. I do appreciate you guys. Each one of you help me in your own way throughout my career here, but this last thing I do truly feel let down on. I really do hope you guys accomplish everything that you choose to accomplish in life. Thank you for your time.

Get Outlook for Android

5.

LB Water
We Make Water Work

540 South High Street | PO Box 60 | Selinsgrove, PA 17870 | Phone 570.374.2355| Fax 570.374.7045 | lbcorp@lbh2o.com | www.lbh2o.com

# Guide on the Use of Disciplinary Action

Human Resources is here to help you with performance management and progressive discipline and to support you in all of your talent management initiatives!

**Sarah Romansik**
Director of Human Resources
Sarah.Romansik@lbh2o.com
Office 570.374.2355 | Cell 703.992.4746

This guide is intended to provide direction to managers regarding when and how to implement the progressive discipline process. Placing an employee on disciplinary action (starting with Formal Written Warning) is formally notifying the employee that he or she **will** be terminated if performance does not improve. It gives the employee specific information on what is deficient in his or her performance and ways to return to a satisfactory level of work. *Except for Documented Verbal Warning level, if you do not intend to terminate the employee on this performance issue, continue to coach and summarize the performance in the employee's performance review. Merit increases may be adjusted to reflect the less than satisfactory performance*

In general, the progressive discipline process is used to address:

- chronic employee behavior that fails to comply with standards of conduct (i.e., often late, unexplained absences, or otherwise fails to take care of business)
- obvious unacceptable behavior (i.e., insubordination, rude, or antagonistic)
- violation of LB Water policy or fleet safety violations

## When to take disciplinary action

1. As close to the infraction as possible (but not in the heat of the moment)
2. When there are reoccurring issues or when you have coached an employee on his or her unsatisfactory performance, (such as work results, procedure violation, or workplace behavior) and there has not been satisfactory improvement. You need to consider the impact of the employee's current level of performance or action. Ask yourself questions such as: Is the unsatisfactory performance creating an unsafe situation or environment? Is the performance producing very serious negative effects on LB Water, the team, and/or customers?
3. The employee takes an action that is so serious that accidents or injuries have/may occur or a high-risk situation is created for LB Water such as losing a valuable customer or threatening other employees.

## Levels of disciplinary action (*In most cases, coaching discussions should have already taken place*)

1. *Documented Verbal Warning* – This level informs the employee that he or she may be terminated if certain actions and/or performance does not improve to satisfactory levels. **This level of action can also be used to formally document an incident in the employee's HR personnel file even if the intention is not to terminate the employee.**

LB Water
We Make Water Work
540 South High Street | PO Box 60 | Selinsgrove, PA 17870 | Phone 570.374.2355 | Fax 570.374.7045 | lbcorp@lbh2o.com | www.lbh2o.com

2. *Formal Written Warning* – Informs the employee he or she has breached a company policy or engaged in unacceptable behavior.
3. *PIP (Performance Improvement Plan)*- Think of a PIP is as an interim performance evaluation that focuses on specific performance issues rather than overall performance. A PIP is used to develop desired performance and/or behavioral change to include:
    - job performance associated with expectations regarding assignments, functional tasks, knowledge and skills
    - adherence to standards or requirements of the job and/or department

   Performance Improvement Plans are intended to deliver a stronger message to the employee than might be given in day-to-day coaching. PIP's clearly indicate that change is needed, communicate the performance expectations, and set a timeframe for improvement.
4. *Final Warning* – Updates the employee on his or her efforts to achieve satisfactory performance/behavior levels and that level has not been reached. Informs the employee performance/behavior has not improved to satisfactory levels and that the next step is termination if the necessary level of performance/behavior is not achieved in the timeframes stated.
5. *Termination* – Used to document the termination action.

*Selection of the level of action depends upon the how serious the situation is, whether progressive improvement steps are being taken, and consistent application is across the company (e.g. fleet violations). The facts and circumstances of each case will determine what action, up to and including discharge from employment, is appropriate. Given this, in some situations, a final written warning may not be warranted depending on severity and therefore termination is the appropriate action.*

### Process for completing and administering the Disciplinary Action Form

1. Discuss with HR and determine appropriate level of disciplinary action.
2. Complete the Disciplinary Action Form. *Write the information in each section so someone outside of LB Water can understand clearly your intent as this document could be used for company defense.*
3. Submit to the appropriate senior manager and HR for review and obtain approval in writing or via email.
4. Coordinate with HR to schedule a meeting with employee in person or by phone.
5. Meet with the employee in a private location on LB Water property.
6. Review the form and answer any questions. Focus on ways to help the employee improve performance or follow procedures (Examples: retraining, scheduling, partnering with skilled employee)
7. Have the employee sign the form to acknowledge he or she is receiving a copy and the form has been reviewed with him or her. If employee refuses to sign, you initial the form, date, and write "Employee refused to sign." You sign the form on the manager signature line and give a copy to the employee.
8. Send original signed form to HR for filing in the employee's HR Personnel File.

***The disciplinary action guide is regarded as a guideline and its interpretation must be adequately flexible in order to adjust to various circumstances.***

(6.)

**Sarah Romansik**

| | |
|---|---|
| **From:** | Adam White |
| **Sent:** | Friday, September 1, 2023 12:51 PM |
| **To:** | Sarah Romansik |
| **Cc:** | Jamie Gelvin |
| **Subject:** | Re: Jonathan Rideout Dismissal |

Sarah, in addition to what I've already sent you. On his way out, Jonathan threw his ELD iPad across the warehouse. He came in the office and cursed me out, was acting in a threatening manner towards myself and other employees. I called the police and he left before they arrived.

Get Outlook for iOS

---

**From:** Adam White
**Sent:** *Friday, September 1, 2023 12:22:47 PM*
**To:** Sarah Romansik <Sarah.Romansik@lbh2o.com>
**Cc:** Jamie Gelvin <Jamie.Gelvin@lbh2o.com>
**Subject:** Jonathan Rideout Dismissal

Sarah,

We had to let Jonathan Rideout go today. He was asked to take the emergency contact after hours phone, and responded that he would not commit to doing so. After repeated discussion, he still refused. I explained that it was part of his job, he agreed to it by taking the job with us, and that I was asking him to take it. He refused again, at which point I said I was directing him to take it. He still refused. Jonathan demanded money beyond normal compensation to hold the phone, which in 2 years has received calls outside of normal hours less than 5 times. I again told him that is not how it works. Jonathan proceeded to lay the phone on the desk in front of me and say he wasn't holding it, and walked out. I brought him back in, offered him one final chance to take the phone and said it was part of his job duties. He refused and remained insubordnate. At this point, I informed him he was no longer employed.

Thanks,

LB Water™ We Make Water Work.

**Adam White**
Location Manager
35 Pleasant Valley Rd
Ephrata, PA 17522
717.738.0389
804.921.0437
717.738.0868
Adam.White@lbh2o.com

ESOP **100% Employee Owned** www.lbh2o.com



J-11

7.

LB Water
We Make Water Work

593 South High Street | PO Box 60 | Selinsgrove, PA 17870 | Phone 570.374.2355| Fax 570.374.7045 | lbcorp@lbh2o.com | www.lbh2o.com

## Authorization to Work in U.S. (E-Verify)

LB Water complies with the Immigration and Control Act of 1986 and employs only U.S. citizens and aliens who are authorized to work in the U.S. As a condition of employment, each new employee must properly and accurately complete, sign, and date the first section of the U.S. Citizenship and Immigration Services Form I9 and submit it to the Human Resources Department within the first three days of employment. (Rehired employees must complete the I-9 if their previous I-9 is more than three years old or no longer valid.)

LB Water is registered with E-Verify, an electronic employment verification system run by the U.S. Department of Homeland Security. LB Water submits all new employees' I-9 information via E-Verify to confirm their identity and work authorization.

## Disability Accommodation

LB Water provides reasonable accommodations to all qualified applicants and employees with a physical or mental disability or pregnancy in accordance with the Americans with Disabilities Act and other applicable law. It is LB Water's policy that no qualified individual with a disability will, by reason of his or her disability, be subject to employment discrimination of any form. A person is a "qualified individual with a disability" if he or she is able to perform the essential functions of the job with or without reasonable accommodation.

LB Water urges any qualified individual with a disability who is in need of a reasonable accommodation to inform Human Resources of his or her condition and particular needs. LB Water will work together with any such employee to determine what if any reasonable accommodations can be provided. LB Water may seek appropriate medical documentation and/or examination as allowable by applicable law. LB Water will treat the entire process with the utmost discretion and on a need-to-know basis only, and will maintain the privacy and confidentiality of any personal medical information in accordance with applicable law.

## Timekeeping

Every employee is responsible for accurately recording all time worked. This is one of the most important responsibilities of every employee. Please refer to LB Water's Timekeeping Policy for additional information. Employees who violate this policy will be subject to discipline, up to and including termination of employment. In addition, any intentionally false time entry or certification of a time entry may be grounds for criminal prosecution.



J-2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JONATHAN RIDEOUT, | : | |
| Plaintiff, | : | |
| | : | NO. 5:25-cv-04766-JMG |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| LB WATER SERVICES, INC. | | : |
| Defendant. | : | ELECTRONICALLY FILED |

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that I served a true and accurate copy of the foregoing document, on all counsel of record, via ECF, on the below date.

**MARSHALL DENNEHEY, P.C.**
*Counsel for Defendant LBWS*

Dated: September 11, 2026 BY: *<u>/s/ Christopher J. Conrad</u>*

Christopher J. Conrad, Esquire
PA Atty. I.D. No. 202348
Daniel P. McGannon, Esquire
PA Atty. I.D. No. 309357

200 Corporate Center Drive, Suite 300
Camp Hill, PA 17011
Ph: (717) 651-3531/(717) 651-3717
Fax: (717) 651-3707
Email: cjconrad@mdwcg.com
dpmcgannon@mdwcg.com

*/s/ Thomas A. Specht*
Thomas A. Specht
PA Atty. I.D. No.: 78686
Suzanne T. Tighe
PA Atty. I.D. No.: 80179

P.O. Box 3118
Scranton, PA 18505-3118
Ph: (570) 496-4600
Fax: (570) 496-0567
Email: taspecht@mdwcg.com
sttighe@mdwcg.com